1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    ARNETT HELTON,                          Case No.  11-cv-04261-JST (PR)

                  Petitioner,
8
                                             **ORDER DENYING PETITION FOR**
9        v.                                  **WRIT OF HABEAS CORPUS;**
                                             **DENYING CERTIFICATE OF**
10   RON DAVIS, Warden,                       **APPEALABILITY**

                  Respondent.
11

12

13       Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to

14   28 U.S.C. § 2254 by petitioner Arnett Helton, challenging the validity of a judgment obtained

15   against him in state court.  Respondent filed an answer to the petition.[1]  Petitioner has not filed a

16   traverse, and the time in which to do so has passed.

17                            **I.  PROCEDURAL HISTORY**

18       On August 9, 2006, an Alameda County jury found petitioner guilty of first degree

19   burglary (Cal. Penal Code § 459) and attempted murder (Cal. Penal Code §§ 187(a), 664).  (Ex. 1

20   at 360-64.[2])  In a bifurcated proceeding, the trial court found true that petitioner had two prior

21   felony convictions (Cal. Penal Code §§ 667(a). 667.5(b), and 1170.12(c)(2)(A)).  (Ex. 1 at 368-

22   69.)  On October 6, 2006, the trial court sentenced petitioner to 32 years to life in state prison.

23   (Ex. 1 at 373.)

24

25   [1] Petitioner initially named F.X. Chavez, former warden of Sierra Conservation Center, as the
     respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ron
26   Davis, the current warden of Valley State Prison, where petitioner is currently incarcerated, is
     hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.
27

28   [2] All references herein to exhibits are to the exhibits submitted by respondent in support of the
     answer.

United States District Court
Northern District of California

Petitioner directly appealed the judgment in the California Court of Appeal.  On November 10, 2009 in a reasoned opinion, the California Court of Appeal affirmed the judgment.  (Ex. 6.) On February 24, 2010 the California Supreme Court summarily denied the petition for review. (Ex. 8.)  Petitioner also filed a state habeas petition in the California Supreme Court, which was summarily denied on March 23, 2011.  (Ex. 10.)  The instant petition was filed on August 30, 2011.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[3]

> On February 22, 2005, at 1:30 a.m., [petitioner] called Latrecia Bledsoe, the mother of his child, from his cell phone.  Bledsoe hung up on him because she was tired.  At 3:00 a.m., [petitioner] called Bledsoe a second time and she again hung up on him.  Before she hung up, [petitioner], who was adamant about talking, threatened to "do something if you don't talk to me."  At 4:30 a.m. that morning, [petitioner] called Bledsoe a third time.  This time he said, "I told you if you didn't talk to me, I was going to do something."

> Between 3:00 a.m. and 4:00 a.m. that morning, the victim, Amber Evans, was asleep in her apartment with her toddler son beside her.  She was more than seven months pregnant.  A strange noise awoke her, which sounded like the blinds in her kitchen.  A short while later, she saw a person standing in the doorway to her bedroom.  The person wore all black clothes, including black gloves and a black, hooded sweatshirt.  She could not see the person's face; only a nose was visible because the drawstrings to the hood were pulled tightly.

> Evans said to the person, "Please don't kill me.  I have a baby."  The person immediately lunged for Evans's throat and began strangling her while she was still in her bed.  Evans lost consciousness about 30 seconds later.  When Evans regained consciousness, she was lying on her back on the floor next to her bed.  Her son was crying loudly from the bed. Her attacker, who was hovering over her, quickly fled.

> Evans reached for the phone next to her bed to call the police and discovered that its cord had been torn.  She grabbed her son and ran around the corner to the home of her friend, Yovonda Hewitt.  Evans arrived at Hewitt's home crying, and said, "Please call the police, because someone just broke into my home and tried to kill me."  After 911 was called, Evans told the dispatcher that someone had just broken into her home and choked her. When the dispatcher asked Evans whether her attacker was male or female, Evans said she

---

[3] This summary is presumed correct.  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

could not tell because of the hood covering the attacker's face.  She testified at trial that she could not identify [petitioner] as her attacker, but stated that his height and weight were consistent with that of the attacker.

An ambulance transported Evans to the hospital, where she was examined and released that afternoon.  While at the hospital, she experienced difficulty swallowing.  She had scratches on her face, and her eyes were black and bloodshot.

[Petitioner]'s fiancée, April Jones, lived with Hewitt.  About 15 minutes after Evans arrived at Hewitt's house, Jones called [petitioner] at his mother's home, which was nearby.  No one answered, so she left a message for him there.  [Petitioner] returned Jones's call about five minutes later, and Jones told him that someone had tried to kill Evans.

After the ambulance took Evans away, [petitioner] arrived at Hewitt's home.  He was wearing dark clothing, and holding a dark, hooded sweatshirt with drawstrings.  [Petitioner] appeared upset and nervous, and mentioned that he had lost his cell phone.

After leaving Hewitt's home, [petitioner] called Jones several times and asked whether she had found out anything else about what had happened to Evans.  [Petitioner] also called Bledsoe about 9:30 a.m. and told her that he had done "something stupid," but would not reveal what he had done.  [Petitioner] asked Bledsoe to tell his kids that he loved them, and told her that he was "on the run."

Around the same time, [petitioner] went to the house of some friends.  There, he appeared to be nervous and jittery, and said that he had done "something stupid."  [Petitioner] said that he believed that Jones was going to Evans's home to cheat on him.  [Petitioner] told one of his friends that he had broken into Evans's house and had almost killed her by strangling her.  [Petitioner] said that if Evans's child had not woken up, he would have killed Evans.  [Petitioner] also said that he had accidentally dropped his phone during the incident, while he was on his way out of Evans's house through the window.

When the police arrived at Evans's apartment, the bedroom appeared to have been ransacked.  The bed's top mattress had been pushed off the bed frame.  Various items were strewn over the floor, including hair braids consistent with Evans's hair and a baby cap which subsequent DNA analysis showed had Evans's blood on it.  Also, the telephone cord in the bedroom had been pulled from the wall or cut.  In the kitchen, the window was open, and the mini-blinds were protruding outward.  Outside, underneath the kitchen window, there was a recycling bin with a bucket stacked on top of it.

In the backyard of the apartment, the officers found a cell phone which had "April's man" as its screen saver, as well as a black knit cap.  Jones identified the cell phone as belonging to [petitioner].  DNA analysis of the cap showed DNA from more than one donor, but that the major donor was [petitioner].

The cell phone led the investigating police officers first to [petitioner]'s fiancée, Jones, and then to [petitioner]'s mother's apartment.  When [petitioner] saw the police arrive at his mother's apartment, he started running.  The police gave chase and succeeded in taking him into custody.

3

At the police station, [petitioner] waived his *Miranda* rights and was interviewed by Sergeant George Phillips.  During the interview, [petitioner] said that he had been angry about Jones taking men to Evans's apartment, which he said he had observed Jones do in the past.  [Petitioner] said that on the morning of the incident he set up objects to climb into Evans's apartment and that at the time he believed that Jones was inside the apartment with another man.  He told Phillips that when he opened the window to the apartment, "things got fuzzy" and he passed out.  [Petitioner] remembered later struggling with someone inside the bedroom until he heard a baby cry.  He then ran, got to the kitchen window, and blacked out again.  He said he dropped his cell phone during the incident.  [Petitioner] added that he did not mean to hurt Evans, and that he had nothing against her, and instead had problems with Jones.

People v. Helton, No. A115489, 2009 WL 3756972, *1-2 (Cal. Ct. App. Nov. 10, 2010) (footnotes omitted).

## III.  DISCUSSION

A.      Standard of Review

        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

        A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

        A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review and state habeas petition.  The Court of Appeal, in its opinion on direct review, addressed the four claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.    Petitioner's Claims

As grounds for relief, petitioner claims that the trial court: (1) gave an inadequate and misleading response to a jury question thereby violating his due process rights; (2) failed to instruct the jury on a lesser-included offense thereby violating his Sixth and Fourteenth Amendment rights; (3) gave a flight instruction that violated his right to due process and lowered the prosecution's burden of proof; and (4) imposed an upper-term sentence in violation of the Sixth and Fourteenth Amendments.

United States District Court
Northern District of California

1

2          1.      Jury Question

3          Petitioner claims the trial court violated his due process rights by giving the jury an

4  inadequate and misleading response to a jury question.  (Petition at 7.)  The Court of Appeal

5  summarized the background of this claim as follows:

6          Near the end of the second day of its deliberations, the jury sent a note to the trial court:
           "We the jury would like the judge to define the legal definition of 'intent' as mentioned in
7          part 2 of count 2 regarding attempted murder."  The court had earlier instructed the jury
           regarding attempted murder as follows: "The defendant is charged in count two with
8          attempted murder.  [¶] To prove that the defendant is guilty of attempted murder, the
           People must prove the following ... two elements: [¶] One, that the defendant took a direct
9          but ineffective step toward killing another person; [¶] and two, that he intended to kill that
10         person."  (See CALCRIM No. 600 [attempted murder].)

11         The court and counsel conferred in chambers about the note.  Then, with both counsel
           present, the court told the jury: "I got your note, and I brought you down here ... because I
12         need some clarification about the request.... When I'm answering questions about the law, I
           want to be as precise as possible.  [¶] Your request has left me with some questions.  I'm
13         not sure exactly what I need to be precise about, so I need to clarify what you're looking
           for here, then formulate a response for you.  My game plan is this: given the time of day
14         [4:22 p.m.], I figured I would bring you down, find out exactly what it is that you're
           looking for in this request, then I'm going to send you home for the night, and I'll have
15         your answer for you in the morning.  This gives me an opportunity to allow the attorneys
16         to digest what we talk about here, and then provide me with whatever input they want to
17         provide me with."

18         The trial court then discussed the jury's note with the jury foreperson.  The court first
           confirmed that the note referred to the second element in the attempted murder instruction
19         (CALCRIM No. 600), "that the defendant intended to kill that person.  Am I correct?"  The
           foreperson agreed that was correct.  The court then asked the foreperson whether there was
20         "something specific that you have in mind that you're looking for me to clear up about that
           particular element? ... [¶] I break it down into two parts.... [¶] The first part is, the
21         defendant intended to kill.  The second part of the sentence is that person.... [D]oes the
           question relate to one of those two parts of the sentence ... ?"  The foreperson responded
22         that "it focuses purely on the intention part [¶] regardless of that person."  The court then
23         asked whether "this focus on the intention part [has] anything to do with the instruction I
           gave a little later, where I said that every crime requires proof of the union or joint
24         operation of act, the act that's committed, and the wrongful intent.  They have to occur at
           the same time ... Does the confusion ... relate to that instruction at all?"  The foreperson
25         responded, "Possibly."

26         The foreperson then explained that "in the jury's mind, there's a big difference between the
27         idea of intending to kill somebody versus purposely wanting to kill somebody.  [¶] ... [¶] ...
           So, in other words, by committing this act, do I intend to kill that person, or do I intend to
28

6

inflict harm to that person?"  The court then asked whether the jury's question was whether it is "enough to simply intend to harm somebody?"  The foreperson responded that he did not think that was the question, and asked the court whether there is "a legal definition of intent?"

The court explained: "The element says that it's required to be proved that the defendant intended to kill that person, so you're asking, when I instructed the defendant intended, is there a further definition of that word 'intended' that would be helpful to you?  Is that what you're asking a legal definition of what I mean by 'intended'?"  The foreperson responded by saying, "So if I do this, do I know that I intend to kill this person versus if I do this, I have no idea if it really will kill him or not?"  The court then asked, "Are you trying to make the distinction between whether somebody wants to achieve a certain result versus whether they know if they do this, it will achieve a certain result?"  The foreperson agreed that this was what the jury was looking for.

The court then said, "In other words, the difference between wanting it to happen and knowing it's going to happen.  When you asked me about wanting before, versus intending, is that the distinction you were trying to make, or have I now confused you?"  The foreperson did not respond.

The court then wrapped up the discussion as follows: "Maybe now that we've kind of gone back and forth with this a little bit, how about if we do this: let's just knock off for the day.  We're coming back tomorrow anyway.  You want to sit down and give it another shot, try to articulate what the issue is?  I think that I have a sense of what the issue is, and apparently, I said it right ... a moment ago.  Everybody seemed to agree with what I said.  The difference between doing something ... for the purpose of achieving a certain result versus doing something knowing that a certain result is going to be accomplished."

But when the court again asked whether that was "the distinction" the jury was making, the court observed that it "[a]pparently" was "not."  The court then acknowledged that it and the jury were "kind of missing each other," and that the court was "having some trouble trying to figure out exactly what you're looking for.  [¶] The answer is, to the one question, there isn't a legal definition for the word 'intended,' so you use that term the way you commonly use that term.  But I think ... I'm going to ask you to come back tomorrow morning, sit down and figure out a different way to ask this that I can try to address, because I want to help you.  I want to answer your question.  I just need to know exactly what the question is.  If I think it's this question, but it's really this question, and if I give you an answer to this one, it might be misleading you on this one.  It could confuse you on this question, and that's what I want to try to avoid.... [¶] ... I just want you to explain where the confusion is.  I'll let it go at that.  I'll let you folks figure it out.  I want to answer your question.  You just need to give me a question that I can answer."  The court concluded by saying that "basically" what it was saying was, "Give me another note in the morning.  [¶] ... [¶] Sit down, retool this note, and let's give it another shot, and let's see if you can give me something on what ... the question is really about, or the issue or confusion, if there is a confusion, and I'll do my best to answer it for you.  So go home, have a safe trip, a nice evening, ... sleep on it, come back in the morning, and starting at 9:30 a.m. we'll be down here, anxiously awaiting your next note to see how I can help you."

The jury returned the next morning to resume its deliberations, but did not submit any more questions to the court. At 2:10 p.m. that afternoon, the jury returned its verdicts, finding [petitioner] guilty of first-degree burglary by entering an inhabited dwelling house or building occupied by Evans with the intent to commit felony assault or murder, and finding him guilty of attempting to murder Evans. However, the jury did not find that the attempted murder was committed willfully, deliberately, and with premeditation.

*Helton*, 2009 WL 3756972 at *3-5 (footnote omitted).

The Court of Appeal found petitioner waived this claim by not raising it in the trial court:

[Petitioner] argues the trial court's response to the jury's request was inadequate and misleading, thereby violating his rights to due process and a fair trial. We conclude that [petitioner] has forfeited this asserted error.

As indicated by the record quoted at length above, defense counsel remained mute on this issue before, during, and after the trial court's colloquy with the jury's foreperson. "A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048, 66 Cal.Rptr.3d 438.) " 'Tacit approval' of the court's response, or lack of response, may be found where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. [Citation.] At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal. [Citation.] ... [¶] Waiver has also been found where the court responds to an inquiry with a correct and germane statement of the law, and the defense counsel proposes no further clarification." (*Id.* at pp. 1048-1049, 66 Cal.Rptr.3d 438; see also *People v. Anderson* (1966) 64 Cal.2d 633, 639, 51 Cal.Rptr. 238, 414 P.2d 366 [concluding that the defendant had forfeited the argument that the trial court erred in failing to amplify or explain the instructions given where defense counsel did not challenge at trial the content of the instructions given or request any additional amplification or explanation]; *People v. Roldan* (2005) 35 Cal.4th 646, 729, 27 Cal.Rptr.3d 360, 110 P.3d 289 ["When a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138"].)

After the court received the jury's note, it conferred with both counsel. The court then spoke with the foreperson at length with both counsel present. The jury returned the following morning to continue its deliberations. Defense counsel had ample opportunities to put an objection on the record, or to request or propose further clarification, but failed to do so. Perhaps this was understandable, as the court's response defining "intended" was "a correct and germane statement of the law." (*People v. Ross*, *supra*, 155 Cal.App.4th at p. 1049, 66 Cal.Rptr.3d 438.)

*Helton*, 2009 WL 3756972 at *5 (footnote omitted).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. See <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991). In cases in

which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.  See id. at 750.  The rule cited here by the Court of Appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules).[4]

Further, the Court of Appeal determined that, even assuming petitioner had not forfeited the claim on appeal, the trial court acted properly in responding to the jury question.  In reaching this conclusion, the Court of Appeal, considered whether there was a reasonable likelihood that the jury misapplied the trial court's instruction on this issue.  Helton, 2009 WL 3756972 at *6.  The Court of Appeal emphasized that where the original instructions are full and complete, the trial court has discretion to assess what additional explanations are sufficient to answer the jury's question and may determine that it should merely reiterate the instructions previously given to the jury.  Id. (citing People v. Beardslee, 53 Cal. 3d 68, 97 (1991)).  The Court of Appeal added that the trial court is obligated to refrain from instructing the jury on principles of law that are irrelevant or have the effect of confusing the jury.  Id. (citing People v. Mobley, 72 Cal. App. 4th 761, 781 (1999)).  Applying these principles, the Court of Appeal concluded that the trial court's limited response "that 'intended' had no 'legal definition' and that the jury should use that term in the way it is commonly used … fulfilled its duty to define a term about which the jury had indicated confusion."  Id. (citing People v. Miller, 120 Cal. App. 3d 233, 236 (1981)).  The Court of Appeal added that the exchange between the trial court and the foreperson made it easy for the jury to submit another note but that the jury simply chose not to.  Id. at *7.

A challenge to a jury instruction solely as an error under state law does not state a claim

---

[4] Although a petitioner may avoid procedural default by showing cause for the default and actual prejudice as a result of the alleged violation of federal law, or by showing the failure to consider the claims will result in a fundamental miscarriage of justice, see Coleman 501 U.S. at 750, petitioner here has made no such showing or even an effort to do so.

United States District Court
Northern District of California

1  cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72

2  (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

3  " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

4  process.' "  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The instruction may

5  not be judged in artificial isolation, but must be considered in the context of the instructions as a

6  whole and the trial record.  Id.  Petitioner also must show actual prejudice from the error, i.e., that

7  the error had a substantial and injurious effect or influence in determining the jury's verdict, before

8  the court may grant federal habeas relief.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing

9  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

10     Here, this Court, having reviewed the record, agrees with the Court of Appeal's finding that

11  the trial court properly responded to the jury's question.  The trial court essentially directed the

12  jury to the attempted murder instruction that had already been given.  (Ex. 1 at 349; Ex. 2 at 1015-

13  16, 1123.)  This was proper.  See Waddington v. Sarasaud, 555 U.S. 179, 196 (2009) ("Where a

14  judge 'respond[s] to the jury's question by directing its attention to the precise paragraph of the

15  constitutionally adequate instruction that answers its inquiry,' and the jury asks no followup

16  question, this Court has presumed that the jury fully understood the judge's answer and

17  appropriately applied the jury instructions.") (citation omitted).

18     Nor can it be said that the trial court's response had a substantial and injurious effect or

19  influence in determining the jury's verdict.  See Calderon, 525 U.S. at 146.  The evidence of

20  petitioner's intent to kill was exceptionally strong.  Petitioner admitted to two friends that he had

21  intended to kill Evans and had "almost killed her."  (Ex. 2 at 404, 406, 417, 825, 841.)  This

22  evidence was corroborated by Evans' testimony that the intruder strangled her until she lost

23  consciousness and by her statement to Hewitt that the intruder had tried to kill her.  (Ex. 2, vol. 9,

24  at 253-54, 269.)  In addition, Evans had a number of visible injuries providing evidence of a

25  violent strangulation – including red marks and broken skin around her neck, a dry bloody lip, a

26  swollen face, and bloodshot eyes.  (Ex. 2 at 809, 848-49.)  Consequently, even assuming there was

27  instructional error, there was no prejudice to petitioner.

28

United States District Court
Northern District of California

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2    ///

3    ///

4         2.       Jury Instruction – Lesser-Included Offense

5    Petitioner claims the trial court violated his Sixth and Fourteenth Amendment rights by

6    failing to instruct the jury on trespass as a lesser-included offense of burglary.  (Petition at 10.)[5]

7    A defendant is entitled to an instruction on a theory of defense only "if the theory is legally

8    cognizable and there is evidence upon which the jury could rationally find for the defendant."

9    United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation

10   omitted).  Due process does not require an instruction be given unless the evidence supports it.

11   See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense

12   required only "when the evidence warrants such an instruction").  Moreover, "[a] state trial court's

13   refusal to give [a requested] instruction does not alone raise a ground cognizable in a federal

14   habeas corpus proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  "The error

15   must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the

16   Fourteenth Amendment.  Id.  "Whether a constitutional violation has occurred will depend upon

17   the evidence in the case and the overall instructions given to the jury."  Duckett v. Godinez, 67

18   F.3d 734, 745 (9th Cir. 1995).  The omission of an instruction is less likely to be prejudicial than a

19   misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987).  A habeas

20   petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that

21   involves a misstatement of the law in an instruction, bears an " 'especially heavy burden.' "

22   Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S.

23   145, 155 (1977)).

24   Here, petitioner's claim that he was entitled to a jury instruction on trespass as a lesser-

25

26   [5] "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."  People v. Birks, 19 Cal. 4th 108, 117-18 (1998).

27

28

United States District Court
Northern District of California

included offense of burglary fails for three reasons.  First, petitioner fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as this, does not present a federal constitutional claim.  Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

Second, the state appellate court determined that, under California law, trespass is not a lesser-included offense of burglary:

> [S]trictly speaking, the allegations of the accusatory pleading in this case do not necessarily include criminal trespass.  The burglary count essentially tracks the language of the burglary statute (§ 459), and simply alleges that [petitioner] entered an inhabited dwelling house "with the intent to commit larceny and any felony."  The burglary count says nothing about entering the dwelling without permission, a necessary element of trespass.  (See § 602.5, subd. (b) [unauthorized entry of dwelling]; see also CALCRIM No. 2932 [elements of trespass are (1) willful entry of the dwelling and (2) entering or remaining in the dwelling without consent].)

Helton, 2009 3756972, at *8.  To the extent that petitioner is challenging the state court's interpretation of its own law, this claim is not cognizable on federal habeas.  Estelle, 502 U.S. at 67-68.

Finally, the Court of Appeal determined that there was no substantial evidence to support a trespass instruction:

> But, even if trespass were a necessarily lesser included offense here based on either the allegations in the information or the relevant statutes, there was not substantial evidence to support a trespass instruction in this case.
> …
>
> [Petitioner] asserts that there was substantial evidence that he lacked the requisite felonious intent for burglary when he allegedly entered Evans's apartment.  He relies on evidence that he was under the influence of intoxicating drugs that night, that he had no personal animosity toward the victim, and that he believed that his fiancée had been with other men in Evans's apartment.  According to [petitioner], the jury could have interpreted this evidence to mean that he "entered the apartment without permission, but not necessarily with an intent to harm Amber Evans."
>
> But even if a reasonable jury were to believe all this evidence, a reasonable jury would not simultaneously absolve him of burglary and convict him of trespass.  The obligation to instruct on lesser included offenses is triggered only when "there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater, but not the lesser."  (*Blair*, *supra*, 36 Cal.4th at p. 745, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)  The problem is that if the jury accepted the evidence highlighted by [petitioner] and also the

evidence establishing a trespass – that [petitioner] entered and remained in the apartment without Evans's permission (§ 602.5) – then there was no substantial evidence of a lack of intent to harm someone inside that apartment.  In other words, the same evidence establishing a trespass, if accepted by the jury, also establishes the requisite intent for burglary.

The evidence establishing entry without permission consisted of evidence that during the wee hours of the morning the perpetrator entered the kitchen window, after propping things up to reach the window, and while wearing an all-black outfit which was obviously intended to conceal his identity.  When Evans saw the perpetrator, she asked him not to kill her, but he nevertheless lunged for her throat.  No reasonable jury could conclude from this evidence that the perpetrator entered the apartment without an intent to commit a felony.  And there was no evidence to establish an intent to steal or to commit any felony other than one involving an attack on someone in the apartment.  The only thing that happened inside the apartment was the attack on Evans.  (See *People v. Sakarias*, *supra*, 22 Cal.4th 596, 621-622, 94 Cal.Rptr.2d 17, 995 P.2d 152 [where there was no substantial evidence defendant entered the house without a felonious intent, the trial court did not err in failing to instruct on trespass as a lesser necessarily included offense of the burglary count].)

Helton, 2009 WL 3756972 at *8-9 (footnotes omitted).

This Court, having reviewed the record, agrees with the Court of Appeal's finding that it is not reasonably probable that the jury could have found that petitioner did not commit a burglary. Consequently, it cannot be said that an instruction on trespass would have resulted in a different verdict.  See Calderon, 525 U.S. at 146.

Accordingly, petitioner is not entitled to habeas relief on this claim.

3.     Jury Instruction – Flight

Petitioner claims the trial court violated his due process rights and lowered the prosecution's burden of proof by giving the jury a flight instruction pursuant to CALCRIM No. 372.  (Petition at 13.)  The Court of Appeal considered and rejected this claim as follows:

*a. Factual Background*

On the day of the incident, Evans met with Sergeant Phillips.  Evans was aware that "April's man" was the screen saver on the cell phone that the police found in her backyard, and she told Phillips that "April" was [petitioner]'s fiancée, April Jones, and put Phillips in touch with Jones.  During his conversation with Jones, Phillips determined that [petitioner] was a suspect in the crimes.  After getting the address for [petitioner]'s mother from Jones, Phillips and some fellow officers went to the mother's apartment at around 3:00 p.m. that afternoon.

While Phillips and one of the officers were on their way to knock on the apartment's front door, another officer approached the back of the apartment.  There, he saw [petitioner]

13

walking toward the back door of the building. The officer told [petitioner] twice that he wanted to speak with him. [Petitioner] continued to walk into the apartment building. As Philips and the other officer approached the front of [petitioner]'s apartment, [petitioner] ran out the front door, shoved one of the officers aside, and ran down the street at a full sprint. Phillips yelled, "Stop[!] Police[!] Stop[!]" The officers chased [petitioner] as he ran down the street until Phillips was able to stop him and take him into custody.


*b. Procedural Background*

At the People's request and over defense counsel's objection, the jury was instructed with CALCRIM No. 372 as follows: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." (See CALCRIM No. 372.)

Before the court gave this instruction, defense counsel argued that it was prejudicial and not supported by the evidence because [petitioner] was arrested about 12 hours after the incident, was arrested at his own home, and had not yet been accused of a crime. The court responded that the instruction was not prejudicial, but that the evidence was prejudicial, "just as any evidence which would tend to your client's guilt is prejudicial. I think that the evidence ... regarding [petitioner] running from the police is certainly relevant on his state of mind. And ... there's a basis upon which the jury could conclude that it's evidence of his consciousness of guilt. They might not. But since ... the evidence is there, it's relevant on that question, it seems appropriate to me to give an instruction on flight...."

…

During his closing arguments, the prosecutor emphasized that [petitioner] had run from the police when they went to talk with him at his home. The prosecutor urged the jury to view this behavior as "consciousness of guilt" per the flight instruction because there was no evidence to suggest that [petitioner] fled from the police for any other reason that the fact that he knew he was guilty. Defense counsel argued that when [petitioner] ran from the police, he did so not because of consciousness of guilt but because he was in an area of Oakland with poor police relations.

*c. Analysis*

[Petitioner] argues that it was error to give the flight instruction because [petitioner]'s flight was neither immediately after the crime nor in response to an accusation that he committed the crime. We conclude that the evidence supported giving the instruction unmodified.

…

The flight instruction the trial court gave here, CALCRIM No. 372, is based on section 1127c, which provides that "[i]n any criminal trial ... where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence.  The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.)

On appeal, we review the propriety of giving the flight instruction de novo.  (*People v. Russell*, *supra*, 144 Cal.App.4th at p. 1424, 51 Cal.Rptr.3d 263.)  We must determine "whether sufficient evidence was presented by the People from which the jury could have reasonably inferred that defendant fled after the commission of the crime." (*People v. Lutz* (1980) 109 Cal.App.3d 489, 498, 167 Cal.Rptr. 309.)  If sufficient evidence was presented, then the "issue as to whether a defendant's conduct constitutes a flight within the meaning of the instruction is a question of fact to be determined by the jury." (*Id.* at p. 499, 167 Cal.Rptr. 309.)  Our Supreme Court has held that a "flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs ... logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694, 268 Cal.Rptr. 706, 789 P.2d 887.)  Indeed in these circumstances, and where the prosecution relies on such evidence to show consciousness of guilt, the court has a duty to give a flight instruction which tracks the language of section 1127c.  (*Ibid.*)  The " 'jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt.' " (*People v. Mason* (1991) 52 Cal.3d 909, 943, 277 Cal.Rptr. 166, 802 P.2d 950 (*Mason* ).)  A defendant's asserted lack of knowledge about the status of police investigations has no bearing on whether a flight instruction is proper.  (*Id.* at pp. 941-942, & fn. 11, 277 Cal.Rptr. 166, 802 P.2d 950.)

[Petitioner] asserts that the flight instruction was improper because he fled from officers 12 hours after the crime, he was "miles from the scene of the crime" at the time, and the police had not yet accused him of the crime.  We are not persuaded and conclude that the trial court properly left to the jury the issue of whether CALCRIM No. 372 applied to the facts of this case.  *Mason* is persuasive.  There, in the context of holding that evidence of a high-speed chase that took place four weeks after the crime was admissible to prove consciousness of guilt, our Supreme Court explained that "[c]ommon sense ... suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murders after only a few weeks.  Nor do our decisions create inflexible rules about the required proximity between crime and flight.  Instead, the facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*Mason*, *supra*, 52 Cal.3d at p. 941, 277 Cal.Rptr. 166, 802 P.2d 950.)

There was sufficient evidence here from which the jury could reasonably infer that [petitioner]'s flight from the police tended to show his consciousness of guilt.  In particular, there was sufficient evidence for the jury to conclude that [petitioner]'s flight from police took place immediately after the crime.  (§ 1127c; CALCRIM No. 372.)  In contrast to the four-week-gap in *Mason*, a mere 12 hours had passed since the perpetrator broke into Evans's apartment in the early morning hours and attempted to strangle her to death.  The

15

fact that [petitioner] was at his mother's home, a short distance from the crime scene, at the time he fled from police further supports giving the instruction.  (See *Mason*, *supra*, 52 Cal.3d at p. 941, 277 Cal.Rptr. 166, 802 P.2d 950 [noting that the defendant's flight took place "only four weeks after, and in the same jurisdiction as" the alleged crime]; cf. *Lutz*, *supra*, 109 Cal.App.3d at p. 499, 167 Cal.Rptr. 309 [flight does not require "the reaching of a far away haven in order to justify the instruction"].)  Moreover, there was no evidence at trial providing an alternative explanation as to why, after police simply asked to speak with him, [petitioner] ran away, pushing one of the officers aside and breaking into a full sprint as he did so.  (See *People v. Southard* (2007) 152 Cal.App.4th 1079, 1091, 62 Cal.Rptr.3d 48 [where defendant argued that he fled from police because he was driving with a suspended license, noting that " 'defendant did not introduce any evidence at trial that his license was in fact suspended, and in any event the jury was free to reject defendant's explanation' "].)

Helton, 2009 WL 3756972 at *10-13 (footnotes omitted).

Petitioner's claim fails for the same reason as his first two claims of instructional error, i.e., it is not cognizable on federal habeas because it is predicated on a challenge to the state court's interpretation of state law.  As discussed, the Court of Appeal found that, under California law, a flight instruction is proper whenever evidence of a defendant's departure from his usual environs permits an inference of guilt.  This Court is bound by said finding.  See Estelle, 502 U.S. at 67-68; Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Further, this Court, for reasons similar to those expressed by the Court of Appeal, finds there was no instructional error.  The jury could have reasonably found that petitioner's flight from the police 12 hours after commission of the crime was motivated by consciousness of guilt.  As noted by the Court of Appeal, there was no evidence at trial providing an alternative explanation for the flight.

Nor did the CALCRIM No. 372 instruction lower the prosecution's burden of proof, as petitioner claims.  Significantly, the challenged instruction tracked the language of California Penal Code section 1127c, which provides:

The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence.  The weight to which such circumstance is entitled is a matter for the jury to determine.

1   Cal. Penal Code § 1127c.  "Our habeas precedent places an especially heavy burden on a

2   defendant who [] seeks to show constitutional error from a jury instruction that quotes a state

3   statute."  Waddington, 555 U.S. at 190 (internal quotation and citation omitted).  The challenged

4   instruction made it clear that the jury had to decide whether petitioner had fled, and if so, what

5   meaning and importance such evidence had to the case.  The trial court also instructed the jury that

6   the prosecutor had the burden of proving guilt beyond a reasonable doubt and that evidence of

7   petitioner's flight was insufficient by itself to establish guilt.  (Ex. 1 at 343; Ex. 2 at 1002, 1012.)

8          Finally, the Court of Appeal determined that, even if there was an instructional error, it

9   was harmless:

10          Even assuming it was error to give the flight instruction, we conclude that there was no
11          reasonable probability that the instruction affected the jury's verdicts.  (See *People v.*
            *Turner*, *supra*, 50 Cal.3d 668, 695, 268 Cal.Rptr. 706, 789 P.2d 887.)  Apart from
12          [petitioner]'s flight from police, there was substantial evidence of [petitioner]'s
            consciousness of guilt prior to his arrest.  After the crime, he called Bledsoe to tell her that
13          he had done "something stupid" and was "on the run."  He also checked in with Jones
            several times during the hours before his arrest to ask her whether she had found out
14          anything else about the crime.  And, most significantly, [petitioner] admitted to friends
            before his arrest that he had broken into Evans's house, had almost killed her by strangling
15          her, and would have killed her if her child had not awakened.  If anything, the flight
            instruction helped the defense by emphasizing to the jury that the evidence of [petitioner]'s
16          flight from the police was not sufficient in itself to establish his guilt.  (See *People v.*
            *Jackson* (1996) 13 Cal.4th 1164, 1224, 56 Cal.Rptr.2d 49, 920 P.2d 1254 ["The cautionary
17          nature of the [flight] instruction[ ] benefits the defense, admonishing the jury to
            circumspection regarding evidence that might otherwise be considered decisively
18          inculpatory"].)

19   Helton, 2009 WL 3756972 at *13.  Based on an independent review of the record, the state court's
20
     finding that petitioner suffered no prejudice from the flight instruction was objectively reasonable.
21
            Accordingly, petitioner is not entitled to habeas relief on this claim.
22
            4.      Upper-Term Sentence
23
            Petitioner claims the trial court's imposition of an upper term sentence based on facts found
24
     by the judge rather than the jury constituted error under Cunningham v. California, 549 U.S. 270
25
     (2007).  (Petition at 15.)  The Court of Appeal summarized the background of this claim as
26
     follows:
27
            The probation officer's report indicated that [petitioner] suffered two prior convictions for
28

United States District Court
Northern District of California

second degree robbery.  The report listed no mitigating factors, but listed six aggravating factors: (1) the crime involved great violence; (2) the victim was particularly vulnerable in that she was seven months pregnant and was in bed asleep along with her infant child when she was attacked; (3) the manner in which the crime was carried out indicated planning, sophistication, or professionalism; (4) [petitioner]'s prior convictions as an adult were of increasing seriousness; (5) [petitioner] had served a prior prison term; and (6) [petitioner]'s prior performance on parole was unsatisfactory.  (See Cal. Rules of Court, rule 4.421, subds. (a)(1), (3), (8), (b)(2), (3), (5).)  The report recommended that [petitioner] "be sentenced to the full extent of the law for the crimes for which he has been convicted."

At the sentencing hearing, the trial court indicated that it had read and considered the probation officer's report.  The trial court imposed the upper term sentence on the attempted murder count, as follows: "I find appropriate the aggravated term of nine years.  I find that aggravating circumstances in this case outweigh any mitigating circumstances.  I don't find any mitigating circumstances to exist, but I do find as aggravating circumstances the fact that the victim was particularly susceptible or vulnerable.  This was every – probably every single woman's nightmare, or maybe every woman's nightmare, being awakened in her bedroom in the middle of the night, while she's lying in bed, by an intruder who physically assaults her.  To make it even worse, her 14-month-old child was lying in bed next to her, and she was pregnant, very near her due date.  All of these, in my mind, count as aggravating circumstances.  The nine year upper term would be appropriate."

Helton, 2009 WL 3756972 at *16.

In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  In Blakely v. Washington, 542 U.S. 296, 303 (2004), the Supreme Court explained that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. (emphasis in original).  Therefore "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." See Cunningham v. California, 549 U.S. 270, 288-89 (2007).  In Cunningham, the Supreme Court, citing Apprendi and Blakely, held that California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent that it contravenes "Apprendi's bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " See id. (quoting Apprendi, 530 U.S. at 490).

Here, the Court of Appeal found there was no <u>Cunningham</u> error, concluding that any of the three recidivist factors listed in the probation officer's report would have justified imposition of the upper term sentence on the enhancement because they fell within the prior conviction exception to the <u>Apprendi</u>/<u>Blakely</u>/<u>Cunningham</u> rule:

> In selecting the upper term, the trial court here indicated that it had considered the probation officer's report, which listed three recidivist factors in aggravation: [petitioner]'s prior convictions as an adult were of increasing seriousness; [petitioner] had served a prior prison term; and [petitioner]'s prior performance on parole was unsatisfactory. (Cal. Rules of Court, rule 4.421, subd. (b)(2), (3), (5).)  The probation officer's report indicated that these factors were based on [petitioner]'s two 1993 felony convictions for second degree robbery, for which he was committed to state prison for three years; on a 2002 misdemeanor violation of section 415, subdivision (1) (fighting in a public place); and on the fact that [petitioner] had twice violated his parole.  [Petitioner] did not, and does not, challenge the accuracy of this description of his criminal record.  Consequently, the recidivist factors in aggravation listed in the report provided a proper basis for imposing the upper term here.  (*Black II*, *supra*, 41 Cal.4th at pp. 818-820, fn. 7, 62 Cal.Rptr.3d 569, 161 P.3d 1130 [noting that the aggravating factor "that defendant's prior convictions were numerous or of increasing seriousness is supported by the probation report, whose recitation of defendant's criminal history was not challenged by defendant in the trial court"].)[6]

<u>Helton</u>, 2009 WL 3756972 at *17.

The Supreme Court has not defined the scope of the prior conviction exception to the <u>Apprendi</u> rule.  See <u>Kessee v. Mendoza-Powers</u>, 574 F.3d 675, 676 (9th Cir. 2009).  In <u>Kessee</u> the Ninth Circuit, applying the AEDPA standard, concluded that the state court's rejection of a <u>Cunningham</u> claim under a broader interpretation of the prior conviction exception than permitted in the Ninth Circuit, was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent.  See <u>Kessee</u>, 574 F.3d at 676.  In this case the Court of Appeal rejected petitioner's claim after finding that all three of the recidivist factors listed in the probation report and considered by the trial court related to prior convictions and therefore justified imposition of the upper-term sentence.  Under AEDPA scrutiny, a broader interpretation of the prior conviction

---

[6]
> Indeed, with respect to his two prior felony convictions, [petitioner] explicitly waived his right to a jury trial, and, in a bifurcated proceeding prior to sentencing, the trial court found that he had suffered those convictions.

1   exception than normally allowed in the Ninth Circuit is permissible as long as the state court's

2   view is reasonable.  See id.  Consequently, the state court's determination that the upper-term

3   sentence was justified based on recidivist factors is not contrary to, and does not involve an

4   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

5   of the United States.  See id. at 679.

6          Moreover, failure to submit a sentencing factor to a jury is subject to harmless error

7   analysis.  See Washington v. Recuenco, 548 U.S. 212, 221-22 (2006); Butler v. Curry, 528 F.3d

8   624, 648 (9th Cir. 2008).  In federal habeas proceedings, there is prejudice if the error had a

9   substantial and injurious effect on petitioner's sentence under the standard set forth in Brecht v.

10  Abrahamson, 507 U.S. 619 (1993).  See Hoffman v. Arave, 236 F.3d 523, 540 (9th Cir. 2001).

11  Applying this standard the court must grant relief if there is "grave doubt" as to whether a jury

12  would have found the relevant aggravating factors beyond a reasonable doubt.  See O'Neal v.

13  McAninch, 513 U.S. 432, 446 (1995).  Grave doubt exists when, "in the judge's mind, the matter is

14  so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."

15  Id. at 453.  Under California law, only one aggravating factor is necessary to set the upper term as

16  the maximum term, therefore any Apprendi error will be harmless if there is no prejudice as to just

17  one of the aggravating factors at issue.  See Butler, 528 F.3d at 648.

18         Here the trial court, after evaluating the evidence, considering the jury's verdict, examining

19  the sentencing materials, and taking into consideration the statements and arguments at sentencing,

20  concluded that the aggravating factor for vulnerable victim was appropriate.  (Ex. 2 at 1144-54.)

21  Under California law, vulnerable means "defenseless, unguarded, unprotected, accessible,

22  assailable, one who is susceptible to the defendant's criminal act."  See People v. Weaver, 149 Cal.

23  App. 4th 1301, 1314 (2007) (citation omitted).  Based on the evidence presented at trial, there is

24  virtually no doubt, let alone grave doubt, that a jury would have concluded beyond a reasonable

25  doubt that Amber Evans was particularly vulnerable.  The undisputed evidence at trial showed that

26  Evans was seven months pregnant and alone in her house with her toddler son at the time of the

27  attack.  The undisputed evidence also showed that Evans was attacked in her bed after the intruder

28

United States District Court
Northern District of California

suddenly awoke her in the middle of the night and began strangling her – all with her toddler son by her side.  Consequently, any <u>Cunningham</u> error was harmless.

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.      <u>Certificate of Appealability</u>

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  <u>See</u> Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  <u>Id.</u> § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

**IV.  CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Ron Davis on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated: October 23, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

21